UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| PENTACLES I, LLC, | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) No.: 3:12-CV-308-TAV-HBG |
| | ) |
| PEGASUS ENERGY RESOURCES CORP., | ) |
| | ) |
| Defendant/Counter-Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| TIMOTHY S. DIACHUN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiff/counter-defendant Pentacles I, LLC's Motion for Summary Judgment [Doc. 20] in which plaintiff moves the Court for summary judgment on several of the issues pertaining to plaintiff's claims for declaratory relief as well as on defendant Pegasus Energy Resources Corporation's ("Pegasus") counterclaim for the breach of the duty of good faith and fair dealing. Defendants filed a response in opposition [Doc. 23], to which plaintiff replied [Doc. 24]. The Court has thoroughly considered the arguments of the parties, in light of the prevailing case law and the record in this case. For the reasons stated herein, plaintiff's motion will be granted in part and denied in part.

**I. Background**

This dispute arises from the Working Interest Purchase Agreement (the "Purchase Agreement") plaintiff and defendant Pegasus entered into in August 2010, under which plaintiff acquired a 65% interest in an oil production facility operated by Pegasus for $3 million, referred to as the Indian Creek Field Project (the "Field") [Doc. 6-1]. Plaintiff agreed to pay the purchase price of $3 million through an initial payment of $600,000 and four subsequent annual installments of $600,000 [*Id.* § 2.2]. Under the Purchase Agreement, plaintiff is entitled to all revenue from the sale of the first 200,000 barrels of oil produced from the Field [*Id.* § 11.1(c)]. Plaintiff also received an option to purchase the remaining thirty-five percent of the working interest in the Field from Pegasus for $5.2 million [*Id.* § 10.3]. In addition, plaintiff obtained the right to have "final policy making authority on matters involving the operation" of the Field, although Pegasus would continue to operate the Field [*Id.* §§ 9.1, 9.2].

Plaintiff also agreed to provide "loans or alternative acceptable funding" to fund capital improvements to the Field, after presenting a plan for the enhancement of oil production to Pegasus [*Id.* § 9.3]. The parties refer to these funds as "buyer loans" [Doc. 6-1 § 9.3]. Defendant Timothy Diachun, the chairman of Pegasus, was to serve as personal guaranty for any such loans, up to $1 million [*Id.*]. Finally, plaintiff agreed to pay a flat rate of $68,000 for the first year after the Purchase Agreement went into effect to cover Pegasus's expenses, and the expenses of operating the Field after the initial twelve-month period [*Id.* § 11.1(b)(2)].

2

By 2011, plaintiff had spent approximately $4.6 million on what it considered to be capital improvements to the Field, and began to present invoices to Pegasus for repayment of these buyer loans. Pegasus, plaintiff alleges, failed to pay any of the invoices it received from plaintiff, and Diachun similarly failed to complete and sign a proper guaranty, as required under the Purchase Agreement. During this time, a dispute also arose as to which of Pegasus's expenses plaintiff has a repayment obligation. As a result of these and other disagreements between the parties, plaintiff filed a complaint seeking declaratory relief and asserting claims for breach of contract in Morgan County Chancery Court, which was subsequently removed to this Court [Doc. 1-1].

In the Complaint, plaintiff seeks declaratory relief as to its obligation to pay Pegasus's operating expenses and Pegasus's obligation to reimburse plaintiff for capital improvements made to the Field [*Id.* ¶ 22]. Plaintiff also alleges a breach of the Purchase Agreement against Pegasus, alleging that Pegasus failed to repay several loans made by plaintiff pursuant to the Purchase Agreement for facility improvement [*Id.* ¶ 31]. Plaintiff also asserts a contract action against Diachon, the chairman of Pegasus, for his failure to properly guarantee the first $1 million in loans as set forth in the Purchase Agreement [*Id.* ¶ 37]. Pegasus filed a counterclaim for breach of contract for plaintiff's failure to pay Pegasus's operating expenses and for a breach of the duty of good faith and fair dealing.

3

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the

4

evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Analysis

In its motion for summary judgment, plaintiff seeks declaratory relief on the following issues: (1) whether plaintiff is obligated to pay certain expenses incurred by Pegasus, including management fees, fees paid to the board of directors, various office expenses, and life insurance premiums for Diachun; (2) whether plaintiff has sole authority to make personnel and operational decisions at the Field; and (3) whether Pegasus is obligated to repay plaintiff for 35% of all funds supplied by plaintiff to make capital improvements to the Field. Plaintiff also seeks summary judgment on Pegasus's counterclaim that plaintiff violated the covenant of good faith and fair dealing.

### A. Principles of Contract Interpretation

Under Kentucky law,[1] interpretation of a contract is a question of law for the court. *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992). Courts look to the language of contracts to determine the parties' intentions.

---

[1] The parties agree that the Purchase Agreement is governed by Kentucky law [Doc. 6-1 § 12.12].

*Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006). "When no ambiguity exists in the contract, [courts] look only as far as the four corners of the document to determine that intent." *Id.* "'Any contract or agreement must be construed as a whole, giving effect to all parts and every word if possible.'" *Am. Dairy Queen Corp. v. Fortune Street Research and Writing, Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010). In the absence of mistake or fraud, courts "construe the wording of the contract in accordance with its plain meaning." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 455 (6th Cir. 2005). When a contract's terms are ambiguous, however, it is appropriate for courts "to resort to extrinsic evidence of familiar rules of construction and interpretation to determine the intent of the parties," *FS Inv., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 497 (E.D. Ky. 2002) (quotation omitted), taking into account "the situation of the parties, the purpose or object of the contract, the conditions under which the contract was made, and the circumstances surrounding the execution of the contract . . . ." *Id.*

With these background principles in mind, the Court turns to the parties' arguments with respect to various provisions of the Purchase Agreement.

### B. Plaintiff's Obligations to Pay Pegasus's Expenses

Plaintiff first submits that summary judgment is proper as to the issue of plaintiff's obligation to pay several categories of Pegasus's expenses. Specifically, plaintiff argues that Pegasus has submitted invoices for expenses that are not related to the operation of the Field, and thus are not covered under the Purchase Agreement. These non-

6

operational expenses include management fees paid to Diachun and another manager, the fees paid to the board of directors for their meetings, office expenses, which include rent paid on maintaining an office space in Diachun's home, as well as the premiums on the life insurance policies for Diachun. In support of this argument, plaintiff notes that, under the agreement, plaintiff is obligated to pay "the expenses of operating the Project" [Doc. 6-1 § 11.1(b)(2)], which only includes the Field itself. Plaintiff also submitted year-end income statements from Pegasus from 2007 through 2009, indicating the breakdown between operating and other business expenses [Doc. 20-8]. These records, plaintiff argues, show that Pegasus is seeking to have plaintiff cover all of its expenses, rather than simply those expenses pertaining to operation of the Field.

At the beginning of the Purchase Agreement, Pegasus is denoted as the "Seller" and plaintiff is denoted as the "Buyer." Immediately thereafter, the Purchase Agreement defines the subject property, the "Fort Payne Formation of the Indian Creek Field Project," which is denoted as the "Project" [Doc. 6-1]. Throughout the Purchase Agreement, then, "Seller" refers to Pegasus, while "Project" refers to the Field. This classification and distinction continues in Article 11, which discusses the distribution of oil revenues. That provision provides that plaintiff is to pay for Pegasus's expenses in two ways at different times: (1) for the first twelve months after the signing of the Purchase Agreement, expenses were paid by plaintiff at a flat rate of $68,000, "regardless of Seller's actual costs in the operation of the Project, which amount may include debt service for the Sellers' debt" [*Id.* § 11.1(b)(1)]; and (2) after the first twelve months,

7

plaintiff was to "fund the expenses of operating the Project, exclusive of Seller's debt service" [*Id.* § 11.1(b)(2)].

The plain language of the contract indicates that the parties did not agree, as Pegasus argues now, that all of Pegasus's expenses would be paid for by plaintiff after the first twelve months. Initially, throughout the document and including this particular subsection, the Purchase Agreement distinguishes between the "Seller," that is, Pegasus, and the "Project," that is, the Field itself. If the parties intended to merely have plaintiff, as buyer, pay for all of Pegasus's expenses, the parties could easily have indicated as much in Subsection (2), rather than using the language, "operating the Project," which refers to the Field. Interpreting "expenses of operating the Project" to mean Pegasus's general expenses would be contrary to the language used by the parties. Although Pegasus now contends that the Field's expenses are equivalent to that of Pegasus, the plain meaning of the Purchase Agreement contemplates an unambiguous distinction between Pegasus, as the corporate entity selling its interest in the Field, and the Field itself.

In looking beyond the words of the Purchase Agreement itself, and examining the circumstances under which the parties entered into the Purchase Agreement, Pegasus has not presented any evidence creating a genuine issue of material fact as to whether the expenses related to the operation of the Field include management fees, board fees, and office expenses. Plaintiff submitted the year-end income statements of Pegasus from 2007 through 2009, which Pegasus originally submitted to plaintiff during the course of

8

their negotiations prior to the Purchase Agreement, which show that Pegasus distinguished Field operating expenses from the general expenses of the business prior to the execution of the Purchase Agreement [Doc. 20-8]. For each year's income statement, Pegasus placed one set of numbers under the heading "Cost of Sales," and the remainder under the heading "Expenses" [*Id.*]. Under Cost of Sales, Pegasus sets forth the costs of management, insurance costs, the lease, and other expenses with the label "Field Operating" [*Id.*]. In other words, these costs represent expenses incurred in the operation of the Field, which were paid out of the revenue generated by oil production. Expenses such as general management fees, life insurance expenses, rent and other office expenses, as well as "meals & entertainment" are set out under the general expenses heading [*Id.*]. These income statements indicate that Pegasus contemplated a distinction between Field operating expenses and general expenses, and represented this distinction to plaintiff during the formation of the Purchase Agreement. This distinction carried over to the Purchase Agreement itself, as evidenced by the parallel uses of the term "operating" in the income statements and in Section 11.1.

Given the language of the Purchase Agreement, and the circumstances surrounding the parties' agreement, the Court finds that plaintiff is not responsible for: (1) the management fees for Diachun or Glen Waters; (2) board fees for Pegasus's board of directors; (3) rent and other office expenses; (4) travel, meal, or entertainment expenses; or (5) life insurance premiums for Diachun.

9

### B. Plaintiff's Authority to Make Personnel and Operational Decisions

Plaintiff next seeks summary judgment on its claim that, under the Purchase Agreement, it has the "sole and exclusive authority" to make personnel decisions related to the operation of the Field [Doc. 22 at 10]. Pegasus argues that it has authority under the Purchase Agreement to operate the field, and that plaintiff cannot interfere with this right.

Section 9.1 of the Purchase Agreement states that Pegasus "shall continue to operate the Indian Creek field after the Closing Date" [Doc. 6-1]. Section 9.2 states that plaintiff "shall have final policy making authority on matters involving the operation of the Indian Creek field," including personnel decisions, equipment modifications, and well flow management [*Id.*]. The language of the Purchase Agreement, then, contemplates a hierarchy in which plaintiff, as the buyer and owner of the controlling interest in the Field and primary recipient of revenues, has final decision-making authority, while Pegasus, as the seller and current possessor of the Field, continues its operations in order to generate a profit for plaintiff. Plaintiff has authority with respect to the manner in which the Field is operated, such as the individuals working at the Field, the equipment being used to generate oil, the rate at which oil is being taken from the Field, and similar policies that ultimately affect plaintiff's revenues. Pegasus's argument that plaintiff cannot interfere with Pegasus's "right" to continue to operate the Field does not negate the language of the contract indicating that plaintiff has the right to govern the manner in which the field is operated and to have final say on all operational matters. Any argument that plaintiff

10

does not have final control over personnel decisions is contrary to the plain meaning of the agreement. Accordingly, plaintiff's motion will be granted as to this issue.

### C. Pegasus's Buyer Loan Payment Obligations

Plaintiff also seeks summary judgment on its claim that Pegasus has an obligation to repay thirty-five percent of all buyer loans used to make capital improvements to oil production levels at the Field. Pegasus contends that the Purchase Agreement does not require Pegasus to repay for amounts spent on capital improvements because no buyer loans occurred. In support of this argument, Pegasus argues that, under the Purchase Agreement, plaintiff was required to present a plan to Pegasus prior to making capital improvements, and Pegasus was required to approve any such plan, neither of which occurred before plaintiff engaged in the improvements for which it now seeks repayment.

Under the Purchase Agreement, plaintiff is required to "provide loans or alternative acceptable funding ('Buyer Loans') to fund capital improvements to the [Field] to enhance oil production" [Doc. 6-1 § 9.3]. Plaintiff is also required to present any plan for the enhancement of oil production to Pegasus "which, if reasonably acceptable to [Pegasus], shall form the basis for the capital improvements" [*Id.*]. The Purchase Agreement also provides that Diachun would personally guarantee any such buyer loans up to $1 million.

11

From this, plaintiff argues, Section 9.3 clearly evidences an intent that plaintiff would provide funding to improve the production of the Field, and that a portion of those expenditures would be paid back by Pegasus. Specifically, plaintiff contends that the parties' use of the term "loan," and the provision requiring a guarantee from Diachun, evidences the parties' intent that plaintiff would be paid back, in part, for its expenditures spent on capital improvements. In addition, plaintiff notes that Section 10.3 of the Purchase Agreement provides that, should plaintiff exercise its option to purchase the remaining interest in the Field, the consideration for such purchase would include the forgiveness of any outstanding buyer loans.

While the Court agrees with plaintiff that Pegasus would be liable for repayment of buyer loans used to make capital improvements to enhance oil production if the conditions set forth under Section 9.3 had been met, the Court concludes that there is a genuine issue of material fact as to whether Pegasus's repayment obligations have been triggered in this case. Initially, there remains a question as to what extent plaintiff presented a plan to Pegasus detailing the capital improvements to be done at the Field. In his deposition testimony, Alvaro Campins, one of the principals for plaintiff, testified that plaintiff had a report made on how to improve oil production before entering into the Purchase Agreement, while admitting that a copy of that report was never provided to Pegasus [Doc. 20-1 at 13]. Campins also stated that plaintiff made a presentation at the headquarters for Citizens Gas Utility District of Scott and Morgan Counties, which also had rights in the property, providing details on their plans for capital improvements, and

12

answering questions, and that Diachun, as representative for Pegasus, was present for that meeting [*Id.*]. Diachun, however, testified that he was only present because he happened to be at the location where the meeting took place, and that he was never formally invited to the meeting by plaintiff, in addition to not being provided any written plan [Doc. 23-1 at 19]. Diachun also testified that there was no video at the meeting, no visual presentation, nor anything presented in writing, and that he told plaintiff's representatives that what he had heard was "vague and confusing" [*Id.* at 18]. Similarly, Diachun stated to one of plaintiff's representatives soon after that he "didn't know what was going on at the meeting" [*Id.*]. From this, it appears that the parties did not have an agreed-upon meaning for the provision that plaintiff was to present a plan, or that there is at least a question of fact as to whether such a plan was presented to Pegasus prior to plaintiff's undertaking the capital improvements for which it now seeks partial repayment, making summary judgment inappropriate.

The Court similarly concludes that there remain factual questions as to whether Pegasus ever indicated that any such plan was "reasonably acceptable" under the Purchase Agreement and how Pegasus was to indicate such acceptance. In its complaint, plaintiff asserts that Pegasus failed to object to the plan at the time it was presented and, given that plaintiff went forward with making capital improvements on the Field, Pegasus similarly ratified the plan once the improvements began. Diachun, however, testified that he "objected" to the work, but was "cautioned by [Campin] that it was technically none of my business and that I was no part of it . . ." [Doc. 23-1 at 21]. Accordingly,

13

plaintiff's motion will be denied as to this issue, and Pegasus's obligation to repay plaintiff's expenses incurred in making capital improvements, as well as the amount Pegasus is obligated to repay, will be decided at trial.

> D. **Pegasus's Counterclaim for Breaching the Duty of Good Faith and Fair Dealing**

Plaintiff finally seeks summary judgment on Pegasus's counterclaim in which Pegasus alleges a breach of the covenant of good faith and fair dealing. In support of this aspect of its motion, plaintiff contends that Kentucky does not recognize a stand-alone claim for breach of the duty of good faith and fair dealing, citing to *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629, 634 (E.D. Ky. 2012). Plaintiff also argues that, even if the Court were to consider the claim on its merits, Pegasus's claim is duplicative of its breach of contract claim. Pegasus argues that the counterclaim is properly alleged under Kentucky law.

"Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)). "A party's breach of the covenant of good faith and fair dealing can potentially be the basis for a viable breach of contract claim." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, --- F. Supp. 2d ---, 2013 WL 1707890, at *6 (E.D. Ky. 2013). A party's assertion of a breach of contract claim on specific provisions does not foreclose the assertion of a breach of the implied covenant of good

14

faith and fair dealing, so long as "there remains an underlying contractual provision to which the breach of the duty of good faith and fair dealing claim may be applied." *Id.*

Pegasus asserts, and plaintiff does not dispute, that the nature of its claim for a violation of the good faith and fair dealing arises from the Purchase Agreement, so that the claim sounds in contract rather than in tort. The Court agrees. Pegasus claims that plaintiff breached the covenant of good faith "by making capital improvements to the [Field], without approval or acceptance by Pegasus, then demanding that Pegasus pay for the cost of those improvements and attempting to setoff or avoid its obligations to Pegasus under the Note and Agreement" [Doc. 3 ¶ 47]. Pegasus alleges that plaintiff's purpose in presenting invoices for capital improvements was to reduce or offset its purchase payment obligations under the Purchase Agreement for the interest in the Field, thereby connecting its good faith and fair dealing claim to the terms of the Purchase Agreement.[2] Plaintiff has failed to show that there is no genuine issue of material fact so as to warrant summary judgment, and Pegasus's claim does not fail as a matter of law under Kentucky law. Accordingly, plaintiff's motion to dismiss Pegasus's counterclaim will be denied.

---

[2] Pegasus also asserts a breach of contract claim for plaintiff's refusal to pay Pegasus's expenses, so that the breach of good faith is not the only basis for Pegasus's contract action [Doc. 3 ¶ 42].

15

**IV. Conclusion**

For the reasons previously stated, plaintiff's Motion for Summary Judgment [Doc. 20] is hereby **GRANTED** to the extent that it is **ORDERED** as follows:

(1) plaintiff is entitled to summary judgment on the issue of whether plaintiff has to pay Pegasus's general expenses beyond those directly related to the operation of the Field under Section 11.1 of the Purchase Agreement; and

(2) plaintiff is entitled to summary judgment on the issue of whether plaintiff has final policy-making authority with respect to personnel decisions at the Field.

Plaintiff's motion is **DENIED** in all other respects, and this case will proceed to trial on the remaining claims and issues.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE