UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

PENTACLES I, LLC,                            )
                                             )
            Plaintiff/Counter-Defendant,     )
                                             )
v.                                           )    No.: 3:12-CV-308-TAV-HBG
                                             )
PEGASUS ENERGY RESOURCES CORP.,              )
                                             )
            Defendant/Counter-Plaintiff,     )
                                             )
and                                          )
                                             )
TIMOTHY S. DIACHUN,                          )
                                             )
            Defendant.                       )

## MEMORANDUM OPINION

This contract dispute involving an oil field is before the Court on the parties' post-trial submissions [Docs. 82–85]. After denying in part plaintiff's motion for summary judgment on November 4, 2013 [Doc. 30], the Court held a three-day bench trial, from April 13–15, 2015, on the remaining claims and issues [Docs. 69–71]. The parties' post-trial submissions focus on Section 9.3 of the Working Interest Purchase Agreement the parties entered into in August 2010.

Under the Agreement, plaintiff Pentacles I agreed to pay three million dollars for a 65% interest in an oil production facility operated by defendant Pegasus [Doc. 30 p. 2]. The Agreement also provides, in Section 9.3, at least one method for facilitating capital

improvements to the oil field.  Section 9.3 falls under the heading "Respective Rights and Responsibilities of Buyer and Seller," and states:

> Buyer shall provide loans or alternative acceptable funding ("Buyer Loans") to fund capital improvements to the Project to enhance oil production.  Buyer shall present to Seller a plan for the enhancement of oil production which, if reasonably acceptable to Seller, shall form the basis for the capital improvements.  Buyer Loans will be personally guaranteed by T.S. Diachun for up to $1,000,000.

[Trial Ex. 1 § 9.3].  The Purchase Agreement denotes the "Seller" as Pegasus, "Buyer" as Pentacles I, and "Project" as the Fort Payne Formation of the Indian Creek Field Project [Trial Ex. 1 p. 1].  T.S. Diachun signed the Agreement as the Chairman of Pegasus [*Id.* at 15].

At the summary judgment stage, the Court addressed whether Pegasus, based on Section 9.3, is obligated to repay Pentacles for 35% of all funds supplied by Pentacles to make capital improvements to the Field [Doc. 30 p. 5].  The Court noted the use of the term "loan," the guarantee from Mr. Diachun, and Section 10.3, which provides, "should plaintiff exercise its option to purchase the remaining interest in the Field, the consideration for such purchase would include the forgiveness of any outstanding buyer loans" [*Id.* at 12].  While the Court agreed "Pegasus would be liable for repayment of buyer loans used to make capital improvements to enhance oil production if the

conditions set forth under Section 9.3 had been met," the Court found a genuine issue of material fact as to whether Pegasus's repayment obligations had been triggered [*Id.*].[1] Accordingly, the Court denied plaintiff's motion for summary judgment as to the Section 9.3 issue and stated, "Pegasus's obligation to repay plaintiff's expenses incurred in making capital improvements, as well as the amount Pegasus is obligated to repay, will be decided at trial" [*Id.* at 14].

Having considered its previous ruling, all the testimony and evidence presented, the parties' arguments, and the relevant and controlling law, the Court is prepared to issue its findings of fact and conclusions of law as to the remaining issues in this case. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."). Those issues are the interpretation of Section 9.3 and its application to the facts at trial; whether Pentacles breached the implied covenant of good faith and fair dealing; and whether, under Section 11.1(b)(2), Pentacles is obligated to pay all expenses of operating the Field until 200,000 barrels of oil are sold.

---

[1] The Court explained, "there remains a question as to what extent plaintiff presented a plan to Pegasus detailing the capital improvements to be done at the Field"; "it appears that the parties did not have an agreed-upon meaning for the provision that plaintiff was to present a plan, or that there is at least a question of fact as to whether such a plan was presented to Pegasus prior to plaintiff's undertaking the capital improvements for which it now seeks partial repayment"; and "there remain factual questions as to whether Pegasus ever indicated that any such plan was 'reasonably acceptable' under the Purchase Agreement and how Pegasus was to indicate such acceptance" [Doc. 30 p. 12–13].

3

# I.      FINDINGS OF FACT

## The Working Interest Purchase Agreement

1.      The Indian Creek Field Project (the "Field") is an oil and natural gas field in Morgan County, Tennessee [Trial Ex. 123 ¶ 1].

2.      In or around 2000, the Field was purchased by defendant Pegasus Energy Resources Corporation ("Pegasus") [*Id.*].

3.      Defendant Tim Diachun helped Pegasus acquire interest in the Field and later became chairman and treasurer of Pegasus [*See* Tr. 351, 356].

4.      Ernie Jahay was Pegasus's "on-site field manager" [Trial Ex. 52].

5.      Since 2006, Pegasus's only source of revenue had been oil production from the Field [Tr. 388].

6.      In 2009, Pegasus began looking for potential financial partners to purchase part of its working interest in the Field and serve as a source of additional capital and increased liquidity [Trial Ex. 123 ¶ 3].  Pegasus identified Pentacles as a potential partner in early 2010 [*See* Tr. 367–68].

7.      Pegasus eventually agreed to sell 65% of its working interest in the Field to plaintiff Pentacles I, LLC ("Pentacles") [Trial Ex. 123 ¶ 4].

8.      The transaction was memorialized in the Working Interest Purchase Agreement (the "Agreement"), executed by Pentacles and Pegasus on August 20, 2010 [*Id.* ¶ 5].

4

9.    The purchase price for Pentacles' 65% interest was $3 million, to be paid in part by a $600,000 payment at closing, with the remainder paid in four annual installments of $600,000 pursuant to the terms of the Agreement and a Term Note [*Id.* ¶ 6].

10.    The outset of the Agreement identifies the parties to the transaction and its nature:

> This Working Interest Purchase Agreement ("Agreement"), dated as of the 20th day of August, 2010, between (i) Pegasus Energy Resources Corp., a Kentucky corporation ("Seller") and (ii) Pentacles I, LLC, a Tennessee limited liability company ("Buyer"). . . .
>
> The Seller owns a ninety-nine and 9/10ths percent (99.9%) working interest in the mineral rights of the Fort Payne Formation of the Indian Creek Field Project in Morgan County, Tennessee (the "Project"), equating to eighty-six and 3/10ths percent (86.3%) of the net revenue interest from the Project (collectively, the "Total Interest"). . . .   The Seller desires to sell and transfer to the Buyer, and the Buyer desires to accept and acquire from Seller, sixty-five perfect (65%) of the Total Interest (the "Interest"), pursuant to the terms and conditions set forth herein.

[Trial Ex. 1 p. 1].

11.    Article 9 of the Agreement is titled "Respective Rights and Responsibilities of Buyer and Seller" [*Id.* at 9].

12.    Under Section 9.2, Pentacles was granted "final policy making authority" on matters involving the operation of the Field, including equipment modification and well flow management [*Id.* § 9.2].  This "final policy making" authority ended on August 20, 2014, the fourth anniversary of the Agreement [*See id.*].

13.    Section 9.3 of the Agreement specifically mentions capital improvements to the Field and contemplates "Buyer Loans" by Pentacles to fund such improvements [*See id.* § 9.3].

14.    Section 9.3 states:

> Buyer shall provide loans or alternative acceptable funding ("Buyer Loans") to fund capital improvements to the Project to enhance oil production.  Buyer shall present to Seller a plan for the enhancement of oil production which, if reasonably acceptable to Seller, shall form the basis for the capital improvements.  Buyer Loans will be personally guaranteed by T.S. Diachun for up to $1,000,000.

[*Id.*].

15.    Pentacles, however, did not loan money or transfer funds to Pegasus so that Pegasus could make capital improvements.

16.    Under Section 10.3 of the Agreement, Pentacles received an option to purchase the remaining 35% working interest in the Field from Pegasus for $5.2 million [Trial Ex. 123 ¶ 8; Trial Ex. 1 § 10.3 ("The consideration for the Remaining Interest shall be five million and two-hundred thousand ($5,200,000.00) plus the forgiveness of any outstanding Buyer Loans to Seller.")].

17.    And under Section 11, Pentacles is entitled to 100% of the net revenue received from the sale of the first 200,000 barrels of oil after the execution of the Agreement [Trial Ex. 123 ¶ 7].  Sections 11.1(b)(2) and (d) further direct how the net revenue must be distributed:

> After the Initial 12 Months and until such time as 200,000 barrels of oil have been sold from the Project, if oil revenues are not sufficient in any month to fund the expenses of operating the Project . . . , then Buyer shall

6

fund to Seller the amount of any shortfall, specifically excluding from operational expenses, Seller's debt service. . . . Any remaining revenues from oil production . . . after the first 200,000 barrels of oil sold from the Project, [will be] paid to the Buyer and Seller based on the respective working interests owned by them.

[Trial Ex. 1 § 11.1].

### The Meeting at Citizens Gas

18.     Pentacles contends it provided alternative acceptable funding for capital improvements and presented to Pegasus a plan for the enhancement of oil production, all within the meaning of Section 9.3, at a fall 2010 meeting held at the Citizens Gas Utility District of Scott and Morgan Counties ("Citizens") [*See* Tr. 38, 136].

19.     Present at the meeting were Mr. Diachun, representatives from Citizens, and representatives from Pentacles, including consultants Wayne Hyman and John Acunto [*See id.* at 38–40, 243, 389–90].

20.     The Court finds the purpose of the meeting, however, as stated by Pentacles director Gustavo Mancera, was to let Citizens know what Pentacles I was doing at the Field and to obtain authorization from Citizens [*Id.* at 53; *see also id.* at 52 (Mr. Mancera stating that "[w]hatever you do" at the Field must be approved by Citizens); *id.* at 278 (Mr. Hyman affirming that he did not have any particular knowledge of why Mr. Diachun was at the meeting)].

21.     At the meeting, Mr. Hyman and Mr. Acunto made presentations about enhancing oil production at the Field [*See id.* at 38–40, 243, 389–90, 464–65; *see also id.*

at 464–65 (Mr. Diachun affirming that Mr. Acunto "presented about what was going to be the capital improvements to the Field")].

22. Mr. Hyman "spoke about some of the details at considerable length;" Mr. Acunto spoke "with gusto and enthusiasm about all that was going to happen or some of the ideas they were having"; and Mr. Diachun asked some questions [*Id.* at 51, 386].

23. Buyer Loans, however, were never discussed at the meeting [*Id.* at 117].

24. And there were no materials handed out, no budget or timeline presented, and no requests for payment from Pegasus or other discussion of how the improvements were going to be paid for [*See id.* at 115–17, 278, 387–88].

25. Similarly, Pentacles had a report prepared regarding the Field after the Citizens Meeting [*see id.* at 283; Trial Ex. 39)], but there is no allegation, and the Court has not found any indication, that the report contains, for example, any discussion or breakdown (or proposed breakdown) of defendants' share of the capital expenses.

26. Of the four recommendations set forth in the report, only two were implemented [Tr. 283].

27. This written report, as well as others prepared by Pentacles consultants, were not provided to Pegasus until this litigation [*Id.* at 373–74, 418].

28. In October 2010, after the Citizens Meeting, Mr. Hyman emailed Pentacles to discuss his "current thoughts concerning exploitation of the referenced oil reserves" [Trial Ex. 26; Tr. 279].

29.     At the time this October email was sent, the process for developing a plan to improve oil production was an evolutionary one and was subject to further development [*See* Trial Ex. 26; Tr. 279].

30.     The Court finds, after the Agreement was executed, neither Mr. Diachun nor Pegasus was asked to fund, or told that they would be funding, any of the alleged capital improvements [*See* Tr. 112 (Mr. Mancera acknowledging "alternative acceptable funding" had to be acceptable to Pegasus but stating there was "no need" to tell Mr. Diachun or Pegasus, at any time, that they would be funding any of the alleged capital improvements); *id.* at 115 (Mr. Mancera, when asked whether Mr. Diachun said he agreed to the plan and was "willing to take a buyer loan for it," responded, "He said the first part. Not [the] last one. He didn't say I will take the buyers loan because he already signed.")].

31.     Nor is there evidence, at the Citizens meeting or thereafter, of any Buyer Loan negotiations or of any discussions of interest payments, of other amounts to be repaid, or of a cost-sharing arrangement for the capital improvements [*See id.* at 387–88 (Mr. Diachun affirming that there was no understanding that Pegasus would have any responsibility for any amount of the money spent on capital improvements); *id.* at 391 (Mr. Diachun stating that he visited the Field to understand the nature of the changes Pentacles was implementing, but affirming he did not have an understanding or expectation that Pentacles would demand 35% of the money they were spending on improvements and that Pentacles did not provide him with budgets or expenditures along

9

the way); *id.* at 128 (Mr. Mancera admitting that, prior to sending the September 2011 invoice, he "never discussed with Pegasus the repayment" for Buyer Loans)].

32.     Nor does plaintiff allege an oral agreement regarding the specifics of defendants' repayment obligations, either before or after the Agreement was executed.

33.     In sum, Pegasus was aware Pentacles was spending money at the Field and that improvements were being made after the Agreement was signed in 2010 and into early 2011 [*see id.* at 391]; however, Pentacles did not mention Buyer Loans or Section 9.3 to Pegasus or seek reimbursement for any alleged capital expenses until September 2011 [*see id.* at 124–25, 399–401; Trial Ex. 23].

**Invoice for Buyer Loans**

34.     A few weeks prior to August 25, 2011, the due date for its first $600,000 annual installment payment [*see* Trial Ex. 3 p. 1], Pentacles alerted Mr. Diachun that it was unable to make the full payment, and requested a modification of the payment terms [*see* Tr. 125; Trial Ex. 13].

35.     Pegasus agreed to accommodate the request, and the parties amended the Agreement to memorialize the accommodation on August 23, 2011 [Trial Ex. 2]. Specifically, Pegasus agreed to allow Pentacles to pay $300,000 by August 25, 2011, with monthly installments thereafter of $50,000 [*See id.*; Tr. 396].

36.     But Pentacles, despite the accommodation, failed to make the $300,000 payment by its due date [Tr. 396–97; Trial Ex. 16].

10

37.     After conversations between Mr. Diachun and Pentacles, on September 16, 2011, Pegasus again agreed to modify the payment terms of the Agreement [*See* Tr. 399; Trial Ex. 17 (providing for a $315,000 payment by September 19, 2011)].

38.     On that same day, however, and just days after receiving a notice of default from Pegasus, Pentacles sent Pegasus an invoice for Buyer Loans (the "September 2011 Invoice") [Tr. 399–400; Trial Ex. 23].

39.     The cover email to the September 2011 Invoice simply states: "Enclosed please find our invoice #2011-01 dated September 16, 2011, for the first year ending [A]ugust 31, 2011, representing 35% of the Buyer Loan amount. Section 9.3 of the Working Interest Purchase Agreement provides for such loans." [Trial Ex. 23].

40.     The September 2011 Invoice alleged that Pentacles had spent $1,503,016.50 on capital expenditures for enhancement of the Field's oil production; demanded that Pegasus pay $526,055.77, or 35% of those expenditures, immediately; and calculated that Pegasus owed only $211,055.77, after subtracting the $315,000 installment payment Pentacles owed Pegasus [*Id.*].

41.     A week later, Mr. Diachun sent an email to Mr. Mancera, stating, in relevant part: "Thank you for the invitation to come down Monday, September 26th, and review support materials for your invoice #2011-01. I would like to understand why you sent the invoice in the first place." [Trial Ex. 18].

42.     Prior to receiving the September 2011 Invoice, Pegasus had not had any discussions with Pentacles regarding Buyer Loans under Section 9.3 [Tr. 128, 401].

43.     Pentacles later created a second invoice, dated December 31, 2011, alleging that Pentacles had spent $4,619,836.30 on capital improvements to the Field, and demanding that Pegasus pay 35% of those expenditures, or $1,616,942.70 [Trial Ex. 24].

44.     The December 2011 Invoice was never presented to Pegasus for payment [*See* Tr. 324, 416–17].

45.     Despite the assertion that Pegasus owed $1,616,942.70 at the end of 2011, Pentacles I's Balance Sheet as of December 31, 2011 makes no mention of the obligation [*See* Trial Ex. 29C].

46.     The alleged debt also was not listed as an asset in Pentacles I's 2011 tax returns, even though minor loan obligations from Mr. Jahay and Mr. Acunto for $938 and $750, respectively, were included [*See* Trial Ex. 29D at Pentacles 1721].

47.     The claimed debt does appear, however, in Pentacles I's Balance Sheet as of December 31, 2012, a year after the second Buyer Loan invoice was prepared and months after this litigation was filed [*See* Trial Ex. 29E].

48.      At trial, Pentacles asserted it is entitled to recover from Pegasus a total of $774,181.52, which is 35% of $2,211,947.21, the amount allegedly spent by Pentacles to fund capital improvements to the Field to enhance oil production [Doc. 82 p. 39].

## II.     CONCLUSIONS OF LAW

**Contract Interpretation Standards**

49.     The parties agree their Purchase Agreement is governed by Kentucky law [Trial Ex. 1 § 12.12; Doc. 30 p. 5 n.1].

12

50.     Under Kentucky law, interpretation of a contract is a question of law for the court. *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992).

51.     Courts look to the language of the contract to determine the parties' intentions. *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006). "When no ambiguity exists in the contract, [courts] look only as far as the four corners of the document to determine that intent." *Id.*

52.     "'Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.'" *Am. Dairy Queen Corp. v. Fortune St. Research & Writing, Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010) (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)).

53.     Absent allegations of mistake or fraud, courts "construe the wording of the contract in accordance with its plain meaning." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 455 (6th Cir. 2005); *see also Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005) ("Kentucky courts will enforce a written instrument strictly according to its terms and will assign those terms their ordinary meaning." (citing *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003))).

54.     When a contract's terms are ambiguous, however, it is appropriate to resort to extrinsic evidence or familiar rules of construction and interpretation to determine the parties' intent. *FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 497 (E.D. Ky. 2002) (citation omitted). The Court may consider "the situation of the parties, the

13

purpose or object of the contract, the conditions under which the contract was made, and the circumstances surrounding the execution of the contract." *Id.*

**Section 9.3 Issues**

55.     Plaintiff argues Pegasus's reimbursement obligation is clear from the four corners of the Agreement [Doc. 82 p. 4]. Specifically, plaintiff claims, "[u]pon Pentacles I's presentation of its capital improvement plan to enhance oil production, Pegasus must repay Pentacles I 35% of capital improvement costs" [*Id.* (citing § 9.3); *see also id.* at 6 ("[N]o reasonable person could interpret the Agreement in any way other than to obligate Pegasus to reimburse Pentacles I for Pegasus's pro rata share of Buyer Loans.")].

56.     Defendants believe Section 9.3 requires plaintiff to "actually provid[e] a 'loan' to Pegasus by transferring funds <u>to</u> Pegasus as operator of the Field" [Doc. 85 p. 21 (emphasis in original)]. It is undisputed no such loan was made, and defendants urge the Court not to "re-write Section 9.3 to reflect Pentacles I's desired interest for an expense-sharing arrangement based upon Pentacles I and Pegasus's respective interests in the Field" [*Id.* at 22].

57.     Plaintiff responds that "nowhere in the Agreement does it say that the 'alternative acceptable funding' must pass through Pegasus before being used to fund capital improvements to the Field" [Doc. 82 p. 5].

58.     As an initial matter, the Agreement provides for Buyer Loans as a way of funding capital improvements but does not prohibit or limit Pentacles from making

14

capital improvements outside the context of Section 9.3 [*See* Trial Ex. 1; *see also* Tr. 180–81].

59.     The parties agree a loan is generally defined as "'[d]elivery by one party to and receipt by another party of [a] sum of money upon agreement, express or implied, to repay it with or without interest.'" *Hamilton v. York*, 987 F. Supp. 953, 956 (E.D. Ky. 1997) (quoting Black's Law Dictionary 844 (5th ed. 1979)); *see also* Black's Law Dictionary (10th ed. 2014) (defining loan as "[a] thing lent for the borrower's temporary use; esp., a sum of money lent at interest").

60.     As for the term "plan," plaintiff cites the following definitions from Merriam-Webster Dictionary: "a set of actions that have been thought of as a way to do or achieve something" and "something that a person intends to do" [Doc. 82 p. 10 n.6 (citing *Plan*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/plan (last visited June 19, 2015)]. The Court notes that Merriam-Webster also defines "plan" as "a detailed agreement for telephone service, medical care, insurance, etc." and "a detailed program (as for payment or the provision of some service)."

61.     In light of the term "alternative acceptable funding," the Court disagrees with defendants that Section 9.3 requires plaintiff to transfer funds to Pegasus before Pegasus can be liable for the cost of capital improvements.

62.     The Court also disagrees, however, based on a plain reading of Section 9.3 and the contract as a whole, that Pegasus must repay 35% of capital improvement costs.

15

63.     First, a pro rata repayment obligation for the cost of capital improvements is not apparent from the face of Section 9.3 or the contract as a whole.  And plaintiff has not pointed to any contract language specifically supporting that Buyer Loans were to be repaid based on the parties' respective working interests in the Field.

64.     While Section 2.2(b) states "Seller and Buyer shall share all expenses arising from the operation and ownership of the Project . . . on a pro rata basis based on the respective working interests owned by them," that commitment does not arise until after the fourth annual $600,000 payment [Trial Ex. 1 § 2.2(b)].  This language from Section 2.2(b) supports that the parties knew how to agree to pro rata cost-sharing and did not do so in the context of Buyer Loans.

65.     Second, Section 9.3 uses the terms "loans," "alternative acceptable funding," and "a plan . . . reasonably acceptable to Seller," and uses them in the context of creating a repayment obligation for which an individual could be personally liable. The Court, therefore, finds Section 9.3 requires defendants to assent in some way to the cost and/or terms of its repayment obligation, in order for a Buyer Loan to have been made.

66.     Plaintiff relies on Section 10.3 in support of its position, but Section 10.3 does not shed light on how defendants' repayment obligation was to be determined [*See* Trial Ex. 1 § 10.3 (stating, if Buyer exercises its option to purchase Seller's remaining 35% interest in the Field, "the forgiveness of any outstanding Buyer Loans to Seller" shall form part of the consideration)]

16

67.     In sum, Section 9.3 is unambiguous.   It contemplates some further agreement by the parties on the extent of defendants' repayment obligation.  The contract is silent on the precise terms of funding and clearly does not provide for a funding arrangement that obligates Pegasus to 35% of capital improvement costs.

68.     "The fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

69.     In light of the aforementioned findings of fact and the contract's plain meaning, the Court finds the contract that has been presented to the Court does not provide for the relief that plaintiff seeks.

70.     First, no Buyer Loans were made.  There is insufficient, if any, evidence that defendants assented to the cost of any repayment obligation for the capital improvements, or that any repayment terms were offered before the September 2011 Invoice.  The parties did not discuss loan terms or other financing arrangements for the capital improvements, let alone a 35% contribution by Pegasus, at the Citizens Meeting or at another time.  When Pegasus finally was asked to contribute 35%, Pegasus did not agree to those repayment terms [*See* Trial Ex. 18 (Mr. Diachun stating, "I would like to understand why you sent the invoice in the first place")].

71.     The existence of a personal guaranty up to $1 million in Section 9.3 does not disturb the Court's findings or sufficiently indicate, having reviewed the contract, that the parties agreed Pegasus would repay Pentacles for 35% of the capital improvement

17

costs [*See* Doc. 82 p. 12 n.9 (Plaintiff's Post-Trial Brief) (claiming that, "[f]rom the beginning, Pegasus and Mr. Diachun were aware that Pentacles I planned to invest roughly $3,000,000 to $4,000,000 in Buyer Loans, hence the reason for Mr. Diachun's personal guaranty in the amount of $1,000,000, or approximately 35% of Pentacles I's planned investment")]. The parties were sufficiently sophisticated to agree to pro rata cost-sharing in another part of the agreement but did not do so in Section 9.3 [*Compare* Trial Ex. 1 § 2.2(b), *with id.* § 9.3].

72.    Put simply, from the contract's terms and the evidence of the parties' actions after the Agreement, Pegasus did not accept a 35% repayment obligation or any other terms of repayment for the money Pentacles spent on capital improvements. Nor were any repayment terms proposed to Pegasus after the Agreement was executed.

73.    Second, the Court does not find that a plan for the enhancement of oil production was presented to Pegasus or that Pegasus found such a plan reasonably acceptable. The plan was still in development at the time of the Citizens Meeting and afterwards, and the reports prepared for Pentacles were not given to Pegasus until this litigation. And the Court does not find the communications between Pentacles and Pegasus, even assuming Mr. Jahay informed Pegasus of his interactions with Pentacles, to constitute presentation of a plan or reasonable acceptance thereof.

74.    Third, even if plaintiff presented a plan and it was reasonably acceptable to Pegasus, Pegasus did not reasonably accept the plan such that it triggered a repayment

obligation under Section 9.3. Without any proposed repayment terms or cost-sharing, no Buyer Loan could be made.

75. Given these findings, plaintiff's breach of contract claims will be dismissed, and the Court need not reach the issues involving Mr. Jahay's agency, the validity of Mr. Diachun's personal guaranty, the significance of the funds spent by legal entities other than Pentacles I, and the extent of plaintiff's damages.

## Whether Plaintiff Breached the Implied Covenant of Good Faith and Fair Dealing

76. "Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) (citing *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)).

77. In order to recover on a claim for breach of a contractually imposed duty, defendants must show the existence of damages. *Powerscreen USA, LLC v. D & L Equipment, Inc.*, 661 F. Supp. 2d 705, 713 (W.D. Ky. 2009).

78. As an initial matter, the Court finds plaintiff was attempting to enforce a contract term it believed the parties had agreed to and therefore did not breach the covenant [*See* Tr. 112 (Mr. Mancera stating there was "no need" to tell Mr. Diachun or Pegasus that they would be funding any of the alleged capital improvements); Tr. 115 (Mr. Mancera stating that Mr. Diachun did not say he would take a Buyers Loan "because he already signed")].

19

79.     And even if Pentacles breached the implied covenant, defendants have not argued how they suffered damages as a result of the breach.  Neither defendants' post-trial brief nor their proposed conclusions of law indicate the type or extent of damages they have suffered because of the alleged breach [*See* Doc. 84 ¶ 244; Doc. 85 p. 32–33]. Plaintiff has paid the entirety of the purchase price owed to Pegasus under the Agreement [Tr. 34, 179–180, 422–23].  And there does not appear to be any suggestion that plaintiff did not make the agreed-upon penalty payments when its payments to Pegasus were late [*See* Trial Ex. 2 (providing for monthly installment payments with interest); Trial Exs. 17, 23 (providing for a $315,000 installment payment by Pentacles)].

80.     Accordingly, defendants' counterclaim for breach of the duty of good faith and fair dealing [Doc. 3 ¶¶ 44–49] will be dismissed.

## Section 11 Issues

81.     The parties stipulate that, from September 2011 through October 2013, Pegasus paid Ernie Jahay or Jahay Consulting $137,240.62 for Mr. Jahay's services and expenses related to the Field, as well as paid $15,844.12 in premiums for liability insurance for the Field, both of which constitute expenses of operating the Field [Trial Ex. 123 ¶¶ 9–10].

82.     In light of the parties' stipulation, and pursuant to Section 11.1(b)(2) of the Agreement, the Court will order plaintiff to reimburse Pegasus in the amount of $153,084.74, plus the statutory pre-judgment interest rate, for its expenses related to the

Field [*Compare* Doc. 83 ¶ 155 (Plaintiff's Conclusions of Law), *with* Doc. 84 ¶¶ 234–35 (Defendants' Conclusions of Law)].

83.     Next, Pegasus requests a declaratory judgment that the Agreement requires Pentacles to pay all of the expenses of operating the Field until 200,000 barrels of oil are sold [Doc. 85 p. 33].

84.     Since the purchase price for plaintiff's 65% interest has been paid in full, "Seller and Buyer shall share all expenses arising from the operation and ownership of the Project . . . on a pro rata basis based on the respective working interest owned by them, *except to the extent otherwise provided in this Agreement*" [Trial Ex. 1 § 2.2(b) (emphasis added)].

85.     Section 11.1(b)(2) of the Agreement provides, "until such time as 200,000 barrels of oil have been sold from the Project, if oil revenues are not sufficient in any month to fund the expenses of operating the Project, . . . then Buyer shall fund to Seller the amount of any shortfall . . . ."

86.     Having reviewed these provisions and the contract as a whole, the Court finds that Pegasus's interpretation accords with the contract language's plain meaning. Pegasus, as Seller under the Agreement, is not responsible for operating expenses until 200,000 barrels of oil have been sold. The Court made a similar finding at the summary judgment stage [*See* Doc. 30 p. 2 ("[P]laintiff agreed to pay . . . the expenses of operating the Field after the initial twelve-month period." (citing § 11.1(b)(2)))].

87. The Court also notes that Pentacles does not appear to dispute Pegasus's interpretation [*See generally* Docs. 82, 83 (Plaintiff's Post-Trial Submissions) (failing to discuss this issue); Doc. 82 p. 8 n.3 (Plaintiff's Post-Trial Brief) ("Pegasus gave Pentacles I the revenue from the first 200,000 barrels for two reasons unrelated to Buyer Loans: (1) Pentacles I had agreed to pay Pegasus's expenses related to the operation of the Field . . . ."); Trial Ex. 9 (Letter from Mr. Mancera to Mr. Diachun dated January 18, 2012) ("According to the Agreement, after the first 12 months, Pentacles must pay the 'expenses of operating' the Indian Creek Field 'out of pocket' in the event revenue from oil production is not sufficient to cover those expenses. . . . Pentacles, under Article 11, is responsible for the expenses of operating the Field.")].

**Issues Not in Pretrial Order**

88. The parties submitted an agreed pretrial order signed by counsel for all parties [Doc. 59].

89. Plaintiff's complaint includes a claim for "quantum meruit/unjust enrichment" [Doc. 1-1 ¶¶ 38–43], but that claim is not listed as one of the issues to be submitted to the trial judge or otherwise mentioned in the pretrial order [*See* Doc. 59 p. 8–9]. Nor was that claim addressed in the parties' post-trial briefs.

90. Similarly, defendants claim in their post-trial submissions that they are entitled to a declaratory judgment that, as of August 20, 2014, the fourth anniversary of the date of the Agreement, Pegasus shall have final policy making authority on matters involving the operation of the Field [Doc. 84 ¶ 237; Doc. 85 p. 34]. This claim, however,

22

also is not listed as one of the issues to be submitted to the trial judge or otherwise mentioned in the pretrial order [*See* Doc. 59 p. 8–9].

91.     The Sixth Circuit has held that a party's failure to advance a theory of recovery in a pretrial statement constitutes waiver of that theory.  *See, e.g.*, *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 442–43 (6th Cir. 2000) (holding that district court was entitled to conclude that plaintiff waived relief under a specific Tennessee Code section when that section was mentioned in plaintiff's complaint but not mentioned in the parties' agreed pretrial order).  The Court, therefore, finds the following claims to be waived: plaintiff's claim for quantum meruit and unjust enrichment, defendants' aforementioned request for a declaratory judgment, and any other claims not mentioned in the pretrial order.

92.     Waiver aside, the Court finds plaintiff has not produced sufficient evidence, or argument, to allow the Court to fashion equitable relief in this case.  And having reviewed the Agreement, it does not appear the end of one party's final policy making authority necessarily reverts such authority to the other party [*See* Trial Ex. 1 § 9.2].

## III.    CONCLUSION

Based on the Court's findings of fact and conclusions of law as stated above, the Court **FINDS** in favor of defendants.  Defendants will therefore **NOT BE LIABLE** for damages to plaintiff.  Plaintiff, however, will be **ORDERED** to reimburse Pegasus in the amount of $153,084.74, plus the statutory pre-judgment interest rate, for its expenses related to the Field.  Accordingly, the Court will **DISMISS** plaintiff's remaining claims,

will **DISMISS** defendants' claim for breach of the implied covenant of good faith and fair dealing, and will **DIRECT** the Clerk of Court to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE